Mr. Williams. Thank you, Your Honors, and may it please the Court. For more than 50 years, the Younger abstention has served as a critical safeguard against inappropriate federal interference in certain important state proceedings. The doctrine was tailor-made for circumstances like this case, which implicate ongoing state administrative proceedings about the important state matter of insurance regulation. The District Court here recognized that each of the basic middle-sex elements normally calling for younger abstention were present here. And on appeal, even Air Evac seems to recognize much the same, putting up only a half-hearted attack on those factors. But the District Court nevertheless lost its way, finding that exceptional circumstances compelled it to nevertheless interject itself into the state proceedings anyway. The District Court was wrong to so hold, and this Court should reverse. In trying to establish exceptional circumstances on appeal, Air Evac crafts the story of a conspiracy among state regulators and legislators. Counsel, can I interrupt you before addressing whether there is or is not extraordinary circumstances? What does West Virginia contend the standard is for us for evaluating the claims made by Air Evac? How do we know whether there is extraordinary circumstances? That was not readily apparent to me from the case law, and maybe there's a position there. But is there a standard or a way we look at that other than just by judging the facts of each particular case? Well, I think one thing we do know from the cases, Your Honor, is that it's only a very narrow set of exceptional circumstances that have been recognized to date. The Younger decision itself expressly refused to sort of lay out the full field of exceptional circumstances, understanding that the word exceptional itself implies sort of an inability to predict every possible circumstance. But what it did say is elements of bad faith, for instance, or a complete inability of the state judiciary to engage with the claims might themselves establish exceptional circumstances. But this Court's decision back in 1981 in the Simopoulos decision, for instance, really stressed that these exceptional circumstances are to be read very, very narrowly. For instance, Air Evac tries to invoke an exceptional circumstances exception based on flagrant and patent unconstitutionality of the state's actions. That case explained that the exception has to be read so narrowly that some have accused the exception basically of being meaningless, that for a state action to fall under that standard, that basically every clause, sentence, paragraph in whatever manner and against whomever an effort might be made to apply to it has to fail under the applicable federal law. So while I can't give you sort of a rigid three-part test that I might like in an ordinary case, what's obvious from all of these cases is that courts are extremely reluctant to apply the particular exceptional circumstances exception to gun or abstention. If a court were to determine that the state's actions were designed for protection, kind of competition protection of a state residence versus legitimate out-of-state competition, would that set – and I understand you wouldn't acknowledge that that's what's happened, but hypothetically if a record established that sort of protectionist efforts, would that be extraordinary circumstances? Sure. So if we assume an illegitimate protectionist motivation, I don't think that the cases actually say that the motive itself would necessarily be decisive. What we would also have to see is baseless prosecution that lacks any basis in the law. So what the cases are looking for is facts or law that affirmatively fail to justify the actions being undertaken by the state regulator or within the state courts. So it really is something, I think of it almost akin to a Rule 11 standard, where you're looking for a completely baseless state action, and it's not just about sort of these subjective motivations or inclinations of the parties involved. I would say that would be somewhat of a risky test because Younger doesn't just look to the prosecutor, for instance, or in this case the insurance commissioner. Younger is looking at the entire state structure as a whole. So it would be impossible, I would say, for a federal court to look at state courts and state regulators and the state legislature and assume that all of these individuals in separate parts of state government are effectively colluding to achieve this illegitimate objective. Frankly, that seems so wholly implausible that that's a standard that it's hard to imagine when that could ever be met. So Younger instead more appropriately looks to sort of the objective bases and whether there is any legitimate objective basis for what the state is purporting to do here. And I think what you see on this record, Your Honor, is that there absolutely is. This is not a case in which regulators, legislators, and courts are working together to run arid, It's a case in which an insurance commissioner was reasonably working to respond to legitimate consumer complaints where you had a legislature who sought to respond to a perceived legislated need, and you had state courts that stood poised to apply both state and federal law to whatever claims or defenses that Arivac would have wanted to raise. Quite simply, there is nothing nefarious. What about the fact that in Dodrill 2, the district court held that the membership program is not insurance? In light of that, what's the good faith basis for the continuance of the enforcement proceedings? Well, a few things, Your Honor. One is that Dodrill 2's determination was at the preliminary injunction stage. So that Dodrill proceeding is still going on. I believe the parties are actually engaged in discovery in that case. So that determination could still be reversed. This court could itself reverse that determination on appeal. So in that way, it's still a live proceeding. The other thing is that Dodrill 2 and the injunction that was issued there were specifically targeted towards the new legislation that had been passed by the West Virginia legislature and specific provisions of the West Virginia Insurance Code. It remains to be seen whether there are still other provisions of that particular article that can nevertheless still be enforced against Arivac despite the holdings that were found and despite the injunction that was issued in the context of Dodrill 2. What's also clear is that the proceeding that was initiated before Dodrill 2 is still there. It has not been ended. It hasn't been canceled. It's obviously not moving forward because of this case, but it's still a live docket in that sense. And in that sense, it's an ongoing proceeding. And while we're just on the subject of Dodrill 2, I'll say this. They would like you to use that case to basically determine that there is no ongoing state proceeding that would meet the first middle sex factor. But every circuit court that we have been able to find looks either to the time that the complaint is filed or the time that the district court is making its younger determination to determine whether or not there's actually an ongoing state proceeding. And of course, Dodrill 2 was issued after both of those points in time in this case. So under any appropriate test, whichever one you would choose, it would not be appropriate to use Dodrill 2 as a basis to say that there's no longer an ongoing state administrative proceeding. So that actually does take us neatly into the middle sex factors, which is whether there is an ongoing state proceeding, whether there is an important state interest implicated, and then whether there is an adequate forum for Air Evac to vindicate its federal and state interests. One, of course, is the one that I just addressed. And Air Evac has essentially given up on its other arguments that it made below, that it was too premature or for some reason that the proceeding wasn't right, and is basing its argument on this sort of flawed analysis premised on Dodrill 2 that, as we just explained, is not supported. So the second argument that they make is there is no legitimate state interest implicated here. But unfortunately, as they seem to sort of do out the brief, they somewhat put the cart before the horse here. They're effectively arguing that because, in their view, they are not an insurance product, we cannot invoke our interest in regulating insurance in purporting to take action against Air Evac. But I hate the phrase beg the question or calls the question because it's so cliche, but if ever there were a time for it, it would be this one. That's the whole point of the proceeding, of course, is to determine whether, in fact, this is an insurance product that is properly subject to regulation by the state of West Virginia. So we, of course, have a generalized interest in the regulation of insurance within the state of West Virginia. And what NOPSI says is that in evaluating the legitimacy and importance of the state interest, you look to the general class of cases that's implicated by this action and not the specific results or the specific individualized action that we're dealing with today. And the general class of cases, of course, is just the regulation of insurance within the state. And on that score, I don't think there can be any debate about the importance of the state interest, not just because of McCarran-Ferguson, but because of statements like those from this court. Back some 30-some years ago, this court was talking about how the regulation of the insurance industry in West Virginia is, quote, a complex state statutory scheme involving policy problems of substantial public importance and interest. That's the Charleston Area Med Center case 6 after 243. So there really can be no debate about the vitality and importance of the state's interest in regulating the insurance market and protecting West Virginia consumers from misleading insurance plans, insolvent insurance plans, insurance plans that really offer no value or risk shifting. And in that sense, that's exactly the sort of interest that the commissioner was seeking to vindicate here. And the third middle sex factor that we also establish is just as important, which is the ability of state forum to offer a place for AIR-EVAC to raise these issues. And AIR-EVAC has really at no point legitimately suggested that it cannot raise these defenses in state forum, forum rather. They have sometimes suggested that because Commissioner Dodrell, back when he was commissioner, they've at least implied that he would not provide them a fair arbiter when he was going to sit over the administrative hearing. Well, Commissioner Dodrell, of course, is no longer commissioner in West Virginia, but even if we assumed he were still there and even if we were sort of looking at the facts as they were at that point, we're overlooking the fact that the state courts still have de novo review over legal issues of the sort that AIR-EVAC is raising here. So you have both a state circuit court that would look at these preemption issues and make its own determination and the West Virginia Supreme Court of Appeals, which would likewise be making its own de novo determination. And, of course, these courts, while not out of the fourth circuit, will act informed by and educated by the same sorts of cases that this court would in applying the law or in this case. So, of course, those courts would consider decisions like Cheatham or decisions in other circuits or whatever authority that AIR-EVAC chose to summon. We, in turn, cite our own authority. The Hundley decision in the Southern District of West Virginia rejected a motion to dismiss. Does the recent federal legislation, the No Surprise Act, bear on this litigation at all? And that act bans the surprise billing by AIR ambulance providers. What I think the No Surprises Act does, Your Honor, is it sort of rebuts the suggestion that AIR-EVAC is trying to raise that there is no place for states in the regulation of AIR ambulance services. Coincidentally, that was also rejected by Cheatham, but we can leave that alone for the moment. The No Surprises Act specifically gives a role for states to implement some of the provisions of the No Surprises Act. And in West Virginia, the offices of the insurance commissioner are the party that's specifically charged with implementing the provisions of the No Surprises Act. So, again, further reflection of how Congress itself is contemplating a role for states in this area. And the state legislature has, in turn, contemplated that the insurance commissioner will be the one to vindicate the state's interests when it comes to these sorts of considerations. So, I think, if anything, Your Honor, the No Surprises Act only supports our position that, unlike AIR-EVAC's position, this is not a hands-off, totally forbidden, no-state approach kind of world that we're living in, that states do still have a role to play in this area. So, especially given considerations like that, and especially given the fact that the middle-sex factors are all met, we go into the exceptional factors approach with all of these sorts of leanings and biases for abstention. And, basically, what we hear is a tale in which a commissioner wanted to advance consumer interests. We hear a suggestion that this commissioner is working with HealthNet, for instance. Well, HealthNet was the complainant. So, yes, the commissioner was communicating, to a limited extent, with HealthNet, as the complainant, about efforts that it might be undertaking relevant to the air ambulance industry and some of these subscription plans. And we hear a suggestion, for instance, that the commissioner was engaged with the legislature on some of these issues. Well, first, I don't see anything nefarious in a state regulator working with legislatures to implement legislative solutions to problems that arise in the course of regulation. But it's also misleading to suggest that the commissioner was behind this specific bill. He was not. In fact, if you look at the record, actually, if you look at the specific addendum that was supplied by AIR-EVAC, they cite, I believe, pages 44 through 46. But if you look at page 46, there's actually a question posed to Commissioner Dodrell. Were you involved, directly or indirectly, in the drafting of this bill? And he answers, no. So, although Commissioner Dodrell was initially involved in a draft of a different piece of model legislation that was put out by a different organization, the bill that ultimately was passed for the West Virginia Legislature was based on the NCOIL model bill, so a conference of legislatures bill, as opposed to the National Insurance Commissioner's model legislation, which was not what the West Virginia Legislature ultimately passed. So, even this idea that the West Virginia Commissioner of Insurance was working on… So, he was involved, initially, in some way, but just not with the actual bill that was ultimately passed? Correct. And, Your Honor, it's entirely appropriate, as I said, for our commissioner to say, I see a problem. Maybe it would be a good idea for the legislature to address this directly, rather than me trying to do it indirectly through administrative regulation. So, there is nothing nefarious in a suggestion that a state agency is talking with legislators or working with legislators to put forth legislation. And, ultimately, in this case, the legislature independently came up with its own solution that it thought was the best answer. And, although, in Dodrell, too, it remains to be seen whether it didn't, in fact, be the best answer, attempting to address a legitimate consumer concern is not a sign of bad faith or a sign of ill will sufficient to defeat all deference to state administrative tribunals. So, I would just suggest that, honestly, Your Honor, much of what we see here is basically the ordinary functioning of state government. And, while there seems to be an attempt to make this an inappropriate action, the record belies most of those characterizations. So, for all these reasons, we would simply ask that you reverse the finding of the district court, reverse the injunction, and allow this proceeding to move forward in state proceedings. With that, I would reserve the rest of my time for rebuttal. Thank you, Mr. Williams. Ms. Taylor? Thank you, Your Honors. May it please the Court, Charlotte Taylor on behalf of Arivec. The district court did not abuse its discretion in declining to abstain. Even if the three middle-sex factors were present in this case, and we dispute that they are, it presents extraordinary circumstances under which younger abstention would be a misbegotten exercise in formalism. Among these are, first, the fact that ever since this Court held in Cheatham that state laws regulating Arivec's membership program are preempted by the Airline Deregulation Act, the Commissioner and other state actors have been deliberately searching for ways to circumvent that holding and regulate Arivec. Second, Arivec will not get a fair hearing in the administrative enforcement proceeding, which was begun in collusion with Arivec's in-state competitor and which the Commissioner expressly stated at the outset was aimed at shutting down Arivec's membership business, not bringing it into compliance with the insurance code, not working on specific consumer concerns to rectify those, but shutting it down. Third, there is unanimity among the federal courts that the state's asserted interest does not, in fact, apply here. This is not the regulation of the, quote, the business of insurance, which is the only area that Congress reserved for the states with the McCarran-Ferguson Act. Why can't West Virginia look at that and decide? I mean, that's the point of the proceeding, or at least one of the points. I mean, why wouldn't West Virginia in its investigative process be able to say, okay, we're looking into this, it's insurance or it's not, and if they make a determination that it is, you appeal it, the courts look at that and say it's not? I mean, you may be right, I'm not really quarreling whether it is or is not insurance, but why can't West Virginia and its court system determine that? Well, as an initial matter, we know that the administrative enforcement proceeding was prejudged. Again, it was stated at the outset that the purpose of it was to shut this business down. The very pendency of the investigation. I asked you a question, didn't I? But if you could include in your answer, and I'll try to be quiet, whether that is amounting to bad faith. I mean, because that's, if it's bad faith, that's one thing. The district court didn't make that finding. And is that argument a bad faith argument? So I'll try to be quiet now and let you maybe handle both of those. Again, you know, the district court did stop short of finding expressly bad faith. She indicated that she was very troubled by the facts and that there could be further, if this court disagrees with the analysis that the district court made, remand for further fact finding on bad faith would be appropriate. But, again, the point of the extraordinary circumstances inquiry, which the Supreme Court stated in Younger, you know, that it was going to be impossible to delineate all the areas where this might arise, is that you might have cases that don't perfectly fit bad faith or patently unconstitutional. But where you have the state insurance commissioner stating at the outset that the entire proceeding was designed to shut us down, again, not to bring us into compliance with state law, then informs our in-state competitor that the investigation is ongoing before we know that it's ongoing. That in-state competitor takes that information and shares it with the Rhone County Chamber of Commerce, again, before we're aware of the investigation, actively using that knowledge to try to undermine our business relationships. We, you know, there's enough indicia that he also appointed himself judge and jury. Instead of having an independent ALJ be the hearing officer, Commissioner Dodge will determine that he was going to sit as the hearing officer. In all of those circumstances, I think there's sufficient evidence that there was a deliberate effort to circumvent Cheatham and a deliberate attempt to shut us down. If that was all we had, stopping short of bad faith, then maybe we could, you know, we would be having a different conversation here. But at the same time, what we have is a unanimous federal consensus that this is not, in fact, regulation of the business of insurance. So first we had, of course, Judge Berger below issuing her preliminary injunction and holding that we are likely to succeed on the merits. Then the Eighth Circuit in guardian flight, in an opinion that the state nowhere cites anywhere in its briefs or addresses, not only held that the same membership program is not the business of insurance, but actually cited and relied upon Judge Berger's decision. And then, of course, Chief Judge Johnston recently issued his preliminary injunction, again, holding that we are likely to succeed on the merits of showing that this is not the business of insurance. The courts, the federal courts don't have to turn a blind eye to all of that authority when it appears in conjunction with these actions of the commissioner that indicated that this result, this proceeding was intended to drive us out of business. I want to get back to Your Honor's question also about why we can't present this in the state courts with a couple of points. One is that my friend suggested that even if this was, this proceeding was infected with bias, that that is okay because it would be, that could be cured by de novo review in the state courts. But that's directly contrary to the Supreme Court's holding in Gibson v. Berryhill, where the Supreme Court expressly held that even the possibility of eventual de novo review doesn't cure a problem of bad faith or bias under Younger. And the other point that I would make as a practical matter is that as we've seen, just the pendency of the enforcement proceeding itself is already inflicting harm on our business, both because we know that Health Net was going out into the market and using the pendency of the investigation against us to try to undermine our business relationships, but also as we have indicated that we have all these ongoing contracts. This is in the record with municipalities, with fire departments, with businesses, as well as with individual consumers. And the uncertainty as to whether the program is going to be allowed to continue is, as we speak, undermining our ability to, you know, make the case that continuing those business relationships is the right decision. Yeah, I mean, I can appreciate that. I'm just trying to put this. I mean, it seems like that would be a risk in any state regulatory situation, the ultimate results of which could be severe. Like, I'm not suggesting these aren't. And so, yeah, without debating that, that just seems like that would be something that happens as a reality of state regulatory efforts. And here the allegations are that it's insurance. And insurance would, I think, pretty clearly be something that the state would be entitled to regulate. You obviously contest that vigorously and cite authority that is to the contrary. And I'm trying to wrestle with the notion of how we as a federal court get to stick our hands into the state system that at least on the surface is about insurance. And it's not like it's a, you know, car wash that they're saying insurance. It's got some stuff that, you know, you disagree with but might have some indicia of insurance. It just seems to me like what you're asking us to do is an extraordinary thing. And, yeah, I'm having trouble with, you know, I guess grasping how the events here would rise to the level that the courts have talked about that would allow an exception to Younger. Again, I think if there was only one of these factors that we might not have extraordinary circumstances. But I think with all the collection of the factors that we do meet that. For example, you know, in the Forrest case, this court held that there were extraordinary circumstances because Congress had made a determination that railroads wouldn't get a fair hearing in states over in state fora when it came to a tax dispute. Now, conceitedly, we don't have a congressional determination that the state courts are unreliable, you know, writ large in this area. But we do have objective evidence that the administrative proceeding was begun in an effort to shut us down in collusion with our in-state competitor and that it, you know, that effectively we're not going to get a fair hearing in that proceeding. The district court said the state courts didn't do a lot on this. But it said while capable, you know, it said it was troubled by the timeline. So, I mean, that seems pretty different of finding below that the state courts are capable, you know, with a congressional determination that you can't get a fair hearing. Well, I think when there's actual evidence of bias in the record and a statement by the adjudicator that the end result of this was going to be to shut down our business, I don't know how you would feel as a litigant entering into that kind of a scenario. But I think that it's a very fair conclusion that the district court, you know, drew that that is at a minimum troubling and we would, you know, submit does suggest bad faith and that the outcome has been prejudged. And then, again, you also have a unanimous federal consensus that the asserted state interest is, you know, is invalid, that this is not the business of insurance. And we know that they were trying to find a way to circumvent this court's holding in Cheatham. This is the one that they came up with, but it's in fact doesn't hold water as a matter of federal law. I wanted to address the suggestion that this enforcement proceeding was undertaken to redress consumer complaints. I believe that my friend acknowledged that actually the complainant was our in-state competitor. Commissioner Dodgewell doesn't get very specific on the allegation that there are consumer complaints, but to our knowledge, and this is something that you can see footnote eight in Cheatham, Judge Johnston's opinion in the parallel proceeding, that he has yet to see evidence of consumer complaints about the membership program. And we're aware of one. And that's significant because, as Judge Berger noted, it's unclear why the state is so dead set on ending the membership program when it is a way of allowing consumers to prepay for air ambulance services at a discount and also a way for municipalities, such as Logan County, to make the decision that they are going to buy memberships, buy this discounted service for their entire set of residents who live there. This is ultimately not a case where the commissioner is stepping in somehow to respond to a real problem on the part of consumers. With respect to the No Surprises Act, this is a complicated question, and I would be happy if the court is interested to submit a supplemental brief on this. But I will say that the No Surprises Act, while it does contemplate a role for state insurance regulators in some areas, specifically was drafted with the recognition that air ambulances are covered by the Airline Deregulation Act and effectively carves them out of some of those provisions that do allow for concurrent participation by the states. I believe, with respect to the question about whether the Extraordinary Circumstances Inquiry doesn't have clear guiding principles, I do think, again, that the Supreme Court has acknowledged multiple times that it's not possible to narrowly delineate the circumstances in which there are going to be extraordinary factors. But I think if you look at the exceptions to younger preemption overall, you can glean principles that can guide how the court should proceed here. There is an exception for patently unconstitutional state legislation, and there's also an exception for bad faith. What both of those indicate is that federal courts don't have to sit on their hands when there's some indication that the state proceeding is not the ordinary good faith prosecution that Younger specifically says federal courts can't intervene in. When you're only dealing with the type of injury of the anxiety and expense and trouble of an ordinary good faith prosecution, that's where Younger applies. But when there's some reason to believe that we're outside that category, whether it's subjective bad faith or patently unconstitutional state law, then you no longer are in that category of Younger cases where deference to the state forum is called for. And again, here we can debate, and I think there would be a need for further fact-finding on whether we get all the way to bad faith, and we could also debate whether this is a facially conclusive preemption claim. But when you add all of that together, we do get to the level of those concerns that Younger leaves room for, which is the federal court doesn't have to just turn a blind eye when there's reason to believe that the state proceeding isn't an ordinary good faith proceeding entitled to that kind of deference. One point that I did want to make as well is that the question whether this court can look at subsequent events to the date of filing, my friend has suggested that the court's hands are tied, that it can't look at anything that happened after either the administrative complaint was filed against us or we filed our federal complaint. That's not the case. If you look at the Supreme Court's decision in Middlesex County itself, which is obviously a seminal decision, the Supreme Court looked at subsequent developments and, in fact, Justice Marshall had a concurrence joined by three other members of the court making explicit that the reason why he was persuaded to join the court's opinion was that the court had taken into account subsequent developments in the landscape surrounding the question whether Younger abstention should apply. And if you would like a federal court decision that also holds that the fact that an ongoing state proceeding is no longer pending after the moment that the federal complaint was filed, I can give you a citation. That would be Pathways v. Dunn, 329 F. 3rd, 108. That's a Second Circuit decision from 2003. Overall, again, I think the fundamental point is that federal courts don't have to be bound. While extraordinary circumstances is a high bar, federal courts don't have to pretend not to see factors that suggest that the state proceeding is not going to give the federal litigant a fair chance to present its federal claims. If the court has no further questions, I'll rest on my briefs at that point. Thank you. Thank you, Ms. Taylor. Thank you. Mr. Williams? Yes, Your Honor. In brief, we heard a number of suggestions, both in the briefs and just now, that these are unusual factual circumstances that justify a departure from the ordinary narrow circumstances in which exceptional circumstances can be found. Mr. Williams? Yes, Your Honor. Do you think the jurisprudential landscape makes a difference in the circumstances? I think the jurisprudential landscape can make a difference, but maybe in a much narrower way than was just suggested. Well, it's pretty broad in terms of what the federal courts have said about this area. Well, what I would say, Your Honor, is that in cases applying younger abstention, they have said that when a case in state court is patently and flagrantly unconstitutional, then in that circumstance, it might be appropriate for exceptional circumstances to be found and for younger abstention not to apply. What about the question that the same question that's ultimately before the federal court now is the one that has been opined by other federal courts and they have been sort of unanimous about their holding? Well, so what I would humbly suggest, Your Honor, is that that's not entirely fair. Okay. There were, in fact, decisions, some of them district court decisions that admittedly have since been revisited. A North Dakota discipline, for instance, I would cite the Hundley decision in the Southern District of West Virginia, which, again, denied a motion to dismiss from air evac premised on the idea that they were not insurance. So it's not, in fact, the case that every single court that has ever looked at this issue agrees that they are not insurance. But that said, again, that's the entire point of the state proceeding is to determine exactly that question. And you indicated that the state proceeding was started as a result of consumer complaints, plural. Where can I find these citizen complaints in the record? So let me be clear, Your Honor. The specific proceeding that started here was a result of a complaint from Health Net, as I understand it. From the competitor? Correct. Okay. I thought I heard you say earlier something about consumer complaints. Yes, Your Honor. Some outcry. I'm happy. You actually anticipated a point that I did want to make, which is that the commissioner receives complaints not just in sort of a written official form, but they hear things on social media. They hear things, like, from a legislature passing on consumer complaints. You actually heard mention, for instance, of air evac talking about their arrangement with Logan County. As I understand it, for instance, the commissioner's offices heard on social media some concern from residents of Logan County about the fees that they were being asked to pay and whether they were actually receiving any services. Was it the commissioner's social media that somebody was writing into, like you would if it was a complaint? So I will be frank, Your Honor. I do not have that level of detail. Okay. It sounds like there weren't any consumer complaints then outside of the competitor complaining. So I will absolutely be clear that, yes, Your Honor. There was chatter on social media by some unknown person. It is a matter sort of of reality, Your Honor, that state regulators often sort of respond to these chatter or legislative concerns that arise in less direct ways. And I think that the sort of pervasive efforts to regulate these sorts of plans are a reflection of the fact that consumers really are concerned about whether they're receiving value and whether they are, in fact, being treated fairly by these organizations. So that ultimately is what led the commissioner to act here. It was not some nefarious plan or conspiracy. Counsel, if I could interrupt and ask one more thing, and I know we're over, so I'll be brief. But you made the point in your initial argument that we should look at the state judicial system as a whole. Your colleague says the Berryhill case suggests that's not the case. Assume we think there's at least some evidence that would support the district court's decision of extraordinary circumstances related to the administrative proceedings. Would you please respond to the point that we can't limit our analysis there and we must look to the state judicial system as a whole, if that's your position? Well, I think that's the position of the younger cases in general, Your Honor. The younger cases ask whether state tribunals fairly offer an appropriate forum for these sorts of claims to be made. So if there's de novo review at both the circuit level and the Supreme Court level, that would seem to be a part of the state court forum. I will say that in Gibson v. Berryhill, they said that a different result would not be required simply because some judicial review might be forthcoming. But in this case, there's both not an indication of, or not a finding rather, by the lower court of actual bias on the part of the decision maker. And by the way, that's no longer the decision maker should this go back. The Commissioner Dodrell is not actually going to be the one who hears this should it go back. But in addition, there will be further review both by the circuit court and by the Western District Court of Appeals. So all that, given that Younger looks to the state court system as a whole, seems decidedly relevant as to the fundamental question of whether they will get a fair shake in West Virginia courts. So for those reasons, Your Honor, we would just ask that you reverse the decision of the lower court. Thank you. Thank you, Mr. Williams, and thank you, Ms. Taylor, for your arguments. And, Ms. Taylor, we can't greet you as we ordinarily could. And, Mr. Williams, same here, but please know that we appreciate your arguments here today, and we wish you well, and be safe. Thank you so much. With that, I'll ask the Deputy Clerk to adjourn the court until this afternoon. The Honorable Court stands adjourned until this afternoon. God save the United States and this Honorable Court.
judges: Roger L. Gregory, Stephanie D. Thacker, A. Marvin Quattlebaum Jr.